Hon. David BRECK, Hon. William Lucas, Hon. Clayton E. Preisel, Hon. Michael Schwartz, and Hon. George E. Montgomery, Plaintiffs,

v.

State of MICHIGAN, Michigan Department of State, Bureau of Elections, Secretary of State Candice Miller, Chief Elections Officer, and Marlene M. Bruns, Clerk for the County of Lapeer, Defendants.

No. 98–CV–74677.

United States District Court,
E.D. Michigan,
Southern Division.

May 4, 1999.

Mayer Morganroth, Southfield, MI, Michael J. Lebow, Farmington Hills, MI, for plaintiff.

S. Randall Field, Marcelyn A. Stepanski, Johnson, Rosati, LaBarge, Aseltyne & Field, PC, Farmington Hills, MI, for defendant Bruns only.

Gary P. Gordon, Asst. Attorney General, Lansing, MI, for all defendants other than Bruns.

## OPINION AND ORDER

FEIKENS, District Judge.

### Introduction

Plaintiffs, the Hon. David Breck, the Hon. William Lucas, the Hon. Clayton E. Preisel, the Hon. Michael Schwartz, and the Hon. George E. Montgomery, (collectively "the judges") have relied upon the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution to challenge the legitimacy of a Michigan election law that will disqualify them on the basis of age from seeking re-election to state judicial office. I hold that their constitutional claim does not win them the opportunity for re-election they seek.

## I. Background

Plaintiffs are state judges who will have attained the age of seventy years before the election date for what could have been their next six-year terms. The current terms for Circuit Court Judge Breck, Probate Court Judge Preisel, and Circuit Court Judge Schwartz expire on January 1, 2001; to seek a following term, their names would need to be placed on the ballot for the November 7, 2000 election. The current terms for Circuit Court Judges Lucas and Montgomery expire later, on January 1, 2003; to seek a following term, their names would need to be placed on the ballot for the November 5, 2002 election.

Michigan election law, however, prohibits each of these judges from running for re-election because each will have attained the age of seventy years before his next possible election date. Article VI, section 19 of the Michigan Constitution provides that "[n]o person shall be elected or appointed to a judicial office after reaching the age of 70 years." The enacting statutory provision for circuit court judges accordingly states: "A person shall not be eligible to the office of judge of the circuit court unless the person ... *at the time of election,* is less than 70 years of age." Mich.Comp.Laws Ann. § 168.411 (West 1989) (emphasis added). An identical statutory provision exists for probate court judges. *See* Mich.Comp.Laws Ann. § 168.431 (West 1989).

On October 28, 1998, the judges filed

their complaint[1], alleging that the Michigan election law for state judicial candidates violates their right to equal protection under the Fourteenth Amendment. In answers filed on November 23, 1998, defendants State of Michigan, Michigan Department of State, Bureau of Elections, Secretary of State Candice Miller, Chief Elections Officer, (collectively "the State" or "the State of Michigan") and Marlene M. Bruns, Clerk for the County of Lapeer, denied that Michigan election law violates the Fourteenth Amendment.

The parties have filed cross-motions for summary judgment. The judges argue that Michigan election law violates the Fourteenth Amendment because it creates an irrational classification that allows some, but not all, judges older than seventy to hold office. The State and Ms. Bruns both counter in separate motions that Michigan election law is constitutional because, while admittedly imperfect, it is nevertheless a rational means for achieving the legitimate goals the State has for its judiciary. The State also contends that the judges' suits suffer from three justiciability defects: first, that the judges lack standing; second, that the judges' suits are not yet ripe; and, third, that the judges' claim does not merit the exercise of my discretionary jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## II. Analysis

Federal Rule of Civil Procedure 56(c) guides my analysis. It provides that a summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." What is in dispute is a single question of law. My

sole task is to determine how the law is to be applied.

## A. Standing

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." The doctrine of standing determines which disputes satisfy this "case or controversy" requirement. *See Allen v. Wright*, 468 U.S. 737, 750–752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (discussing standing's relationship to Article III). Thus standing can be described as a test used "to identify those disputes which are appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990).

The Supreme Court has determined that "the irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). First, plaintiff must demonstrate an "injury in fact"—an "invasion of a legally protected interest" which is "concrete and particularized" and "actual or imminent." *Id.* Second, plaintiff must demonstrate "a causal connection between the injury and the conduct complained of"; in other words, the injury must be "fairly trace[able] to the challenged action of the defendant." *Id.* And, third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Id.* at 561, 112 S.Ct. 2130. To obtain a summary judgment, plaintiff has the burden of proving by evidence of "specific facts" that these elements are met. *Id.*

The State argues that the judges lack standing because they have failed to meet this evidentiary burden with respect to *Lujan*'s injury-in-fact element.[2] The

1. This original complaint named only Judges Breck, Lucas, Preisel, and Schwartz as plaintiffs. On November 23, 1998, the judges filed an amended complaint that added Judge Montgomery as a named plaintiff.

2. The State does not contest the causation and redressability elements of the *Lujan* test. From my review of the pleadings, motions, briefs, and evidence before me, I find that the

State claims that the judges' alleged injury—unconstitutional disqualification from eligibility for state judicial office—is too speculative because intervening events between now and the next set of elections, such as illness, death, or the actions of independent third parties, could render some, or all, judges unable to seek re-election. The judges argue that they have fulfilled their injury-in-fact burden of proof because they have filed affidavits that evidence their intent to seek re-election.[3] The judges note that there can be no dispute with the certain fact that Michigan election law, as it applies to them, will disqualify them from attempting re-election bids.

The State's argument primarily relies on *Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), a decision issued well before today's standing doctrine was fully developed by the Supreme Court. In Golden, the plaintiff, who had been prohibited during a past election from distributing handbills attacking an incumbent congressional candidate, threatened again to distribute illegal handbills if the same candidate ran in an upcoming election. *See id.* at 109, 89 S.Ct. 956. During the course of the case, it became clear that the targeted candidate was no longer a United States Congressman, was instead a judge, and had no plans to run for Congress in the next election. *See id.* The Court held that these facts did not demonstrate a controversy of "sufficient immediacy and reality." *Id.*

■ *Golden* does not control this case. The future injury here is real and substantiated. It does not depend on the unpredictable, uncertain, or unlikely actions of an independent third party. The specific facts establish that when the judges attempt to seek re-election, as they have sworn they intend to do, Michigan law will

prohibit them from submitting valid affidavits of candidacy because of their age. *See* Mich.Comp.Laws Ann. § 168.413a (West 1989) (requiring an incumbent circuit court judge who desires candidacy to file an affidavit attesting, *inter alia,* to being less than seventy years old "by the date of election"); Mich.Comp.Laws Ann. § 168.433a (West 1989) (identical requirement for incumbent probate court judges). Denied the opportunity to submit these affidavits lawfully, the judges will be ineligible for re-election and will have suffered an allegedly cognizable injury to their federal right to equal protection.

In addition to being concrete and particularized, the future injury in this case is also imminent. The Supreme Court's understanding of imminence in *Lujan* is an instructive contrast. In that case, the Court held that the alleged future injury was not imminent because plaintiffs had not shown *when* the injury was likely to occur. *See* 504 U.S. at 564, 112 S.Ct. 2130. As the Court explained, "the plaintiff alleges only an injury at some indefinite future time." *Id.* at 564, n. 2, 112 S.Ct. 2130.

Here, however, the *when* is known. Not less than 120 days before the next primary election for their judicial office, the judges must file valid affidavits of candidacy with the Secretary of State in order to be eligible for that primary. *See* Mich.Comp. Laws Ann. § 168.413a (West 1989); Mich. Comp.Laws Ann § 168.433a (West 1989). The primaries are held in August. For Judges Breck, Preisel, and Schwartz, this means they must attempt to file their eligibility affidavits by or before April of 2000. For Judges Lucas and Montgomery, the filing deadline would be sometime in April of 2002. Thus for three of the judges, the future injury—alleged unconstitutional disqualification from eligibility for state judicial office—will occur, at the latest, in less

---

judges have satisfied their burden of proof with respect to these two elements.

**3.** All five judges state in these affidavits that each "intend[s] to seek election to [his present] office at the next election," and that each "will be prohibited from being elected to [that] office by the at issue laws."

than a year, and for two of them, in less than three years.

These certain deadlines, in combination with the judges' credible intent to attempt re-election bids, establish that the future injury in this controversy is "certainly impending," not merely allegedly "possible." *Whitmore,* 495 U.S. at 158, 110 S.Ct. 1717 (summarizing cases where plaintiff failed to satisfy imminence requirement because had alleged only "possible future injury"). The State's pure speculation that one, or all, of the judges in this case could be incapacitated due to illness or death before the injury occurs does not alter my analysis. It would be absurd to hold that a plaintiff who desires standing to challenge a certainly impending injury must show that he or she would remain alive and healthy up to the time of injury. *Lujan* in no way suggests that such a showing is necessary.

I hold that the judges have satisfied their burden of proof on summary judgment by demonstrating that the future injury in this case is sufficiently concrete and imminent to satisfy the injury-in-fact element of the standing doctrine. The judges' suits present a controversy appropriate for resolution in an Article III court.

### B. Ripeness

▉ The question of ripeness essentially asks whether the judges' suits, while presenting a genuine Article III controversy, are nevertheless premature for judicial resolution. *See Adult Video Ass'n v. U.S. Dep't of Justice,* 71 F.3d 563, 567 (6th Cir.1995). As the United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") has explained, "[t]he ripeness doctrine not only depends on the findings of a case and controversy and hence jurisdiction under Article III, but it also requires that the court exercise its discretion to determine if judicial resolution would be desirable under all of the circumstances." *Brown v. Ferro Corp.,* 763 F.2d 798, 801 (1985), *cert. denied,* 474 U.S. 947, 106 S.Ct. 344, 88 L.Ed.2d 291 (1985). Three factors

are to be considered in determining whether the judges' suits are ripe: 1) "the likelihood that the harm alleged by plaintiffs will ever come to pass"; 2) "whether the factual record is sufficiently developed to produce a fair adjudication of the parties' claims"; and 3) "the hardship to the parties if judicial relief is denied at this stage of the proceedings." *Columbus Community Cable Access, Inc. v. Luken,* 923 F.Supp. 1026, 1029–30 (S.D.Ohio 1996) (citing *Adult Video,* 71 F.3d at 568).

As to the first factor, the State relies on the Supreme Court's decision in *Renne v. Geary,* 501 U.S. 312, 321, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991), to support its argument that the judges' sits are not ripe because the harm is too speculative and unlikely. In *Renne,* the Court held that a suit brought by plaintiff political parties, which alleged the unconstitutionality of a provision of the California Constitution that prohibited plaintiffs from endorsing candidates for nonpartisan offices, did not present a "ripe controversy." *Id.* The Court found dispositive the fact that there was no "factual record of an actual or imminent application" of the provision to the plaintiffs "sufficient to present the constitutional issues in 'clean-cut and concrete form.'" *Id.* at 321–22, 111 S.Ct. 2331. The Court noted that "[t]he record also contains no evidence of a credible threat that [the provision] will be enforced." *Id.* at 322, 111 S.Ct. 2331.

▉ I find that the facts here satisfy the ripeness concerns of the Court in *Renne.* The likelihood that the harm alleged by the judges will come to pass is high. There is no dispute that Michigan election law disqualifies the judges from running for re-election on the basis of their age. The judges' affidavits make it plain that they will directly confront the law at issue. Moreover, the State nowhere argues that this law will not be enforced against the judges. Thus the factual record demonstrates a more than "credible threat" of enforcement. *Id.*

The second factor, a sufficiently developed factual record for the purpose of fair adjudication, also supports the judges' position. This is a case that presents only a single legal question. The two facts that play a material role in the fair resolution of that question on summary judgment—the age of each judge at the time of the next elections and their intent to seek re-election despite their age disqualification—are not in credible or serious dispute. The factual record as it now stands would gain no material benefit from further development either by discovery or delay.

The third factor, the hardship to the parties if judicial relief were denied at this time, also favors the judges. A decision now, when the factual record is sufficiently developed, would spare the parties significant hardship because each would have time to prepare their responses to my judgment sufficiently in advance of the 2000 election.

I hold that, in light of all of the circumstances, judicial resolution of this case at this time is desirable and within my discretion. The judges' suits are ripe.

## C. Discretionary Jurisdiction Under the Declaratory Judgment Act

The judges seek declaratory and injunctive relief. The State argues that I should decline to exercise my discretionary jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and thereby deny the judges any relief in this case. The State asserts that exercise of my declaratory jurisdiction is improper here because I should not decide issues of constitutional import when the judges assert allegedly speculative future injuries.

It is well established in the Sixth Circuit that jurisdiction to grant relief under the Declaratory Judgment Act is discretionary. *See Aetna Cas. & Sur. Co. v. Sunshine Corp.*, 74 F.3d 685, 687 (6th Cir. 1996). The Sixth Circuit has set out five factors to consider in determining whether to exercise declaratory jurisdiction:

1) whether the declaratory action would settle the controversy;

2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;

3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for *res judicata;* "

4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach on state jurisdiction; and

5) whether there is an alternative remedy which is better or more effective.

*Id.* (quoting *Grand Trunk Western Railroad Co. v. Consolidated Rail Corp.*, 746 F.2d 323, 326 (6th Cir.1984)).

■ All five factors favor exercising my declaratory jurisdiction in this case. First, a declaratory judgment would efficiently resolve this purely legal, as opposed to factual, controversy between the parties. Second, it would also serve a useful purpose in clarifying the legal relations between the parties—guidance all apparently desire as indicated by their cross-motions for summary judgment on the merits. Third, there is no sense here of procedural fencing or of a race for *res judicata.* Fourth, a determination of the federal constitutional question in this case would not improperly encroach on state court jurisdiction. And, fifth, I see no alternative remedy for the judges that would be superior to the one they seek here.

In arguing against the exercise of my declaratory jurisdiction, the State fails to address the Sixth Circuit's *Aetna* test and instead cites to *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 494 (1st Cir.1992), a decision in which the United States Court of Appeals for the First Circuit instructed its lower courts to be "chary about adjudicating constitutional rights by means of declaratory judgment actions" and to address "uncertain questions of constitutional law ... only when absolutely necessary."

The State contends that the equal protection question raised by the judges falls within *El Dia*'s category of "uncertain questions" undeserving of federal declaratory jurisdiction.

I disagree. While the judges have raised arguments new in the case law, the equal protection question in this case nevertheless is one that can be resolved with certainty. Moreover, *El Dia* does not control the issue of my declaratory jurisdiction. As case law from outside the Sixth Circuit, it is not controlling precedent, and so to the extent that it advocates tighter constraints on my discretion than that afforded by the Sixth Circuit in *Aetna*, I do not follow it.

I hold that the exercise of my discretionary jurisdiction under the Declaratory Judgment Act is proper in this case pursuant to *Aetna*.

### D. Equal Protection Merits

The Equal Protection Clause of the Fourteenth Amendment provides that "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." The judges contend that the State of Michigan violates this constitutional command through election laws that permit some, but not all, incumbent state judges to serve past age seventy. In other words, the judges claim that the way in which the State imposes an age limit on its judicial officeholders—by making a candidate's eligibility depend on age at the time of election—results in an irrational and unfair legislative classification that violates the judges' right to equal protection.

The State and Ms. Bruns contend, on the other hand, that imperfect classifications are not necessarily constitutionally irrational ones. Both argue that the age-based eligibility classification of Michigan election law is a rational means for achieving a variety of legitimate goals the State has for the structure and composition of its judiciary, including its interest in having efficient, orderly, and democratic transitions between judicial officeholders.

■ All parties take the correct position that the proper standard to apply to the judges' equal protection challenge is rational basis review. If no fundamental right or suspect classification is at issue in an equal protection case, then the state need only demonstrate that its action bears some rational relationship to some legitimate governmental interest. *See Zielasko v. State of Ohio*, 873 F.2d 957, 959 (6th Cir.1989). Such is the situation here. No fundamental right is at stake; the Supreme Court has held that the right to run for office does not qualify as such. *See Bullock v. Carter*, 405 U.S. 134, 142–43, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). Nor is there a suspect classification here; the Court has determined that age-based classifications do not deserve that label. *See Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976).

■ Thus the judges have recourse only to rational basis scrutiny, a level of review that the Court has called "the most relaxed and tolerant form of judicial scrutiny under the Equal Protection Clause." *Dallas v. Stanglin*, 490 U.S. 19, 26, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989). Under such scrutiny, "[c]lassifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the [s]tate's goals and only if no grounds can be conceived to justify them." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). In the end, the essential question of rational basis scrutiny in a case of this kind is not whether the state's classification is a wise, or just, or good, policy decision, but whether it is rational in light of the state's objectives. *See Murgia*, 427 U.S. at 317, 96 S.Ct. 2562.

Ms. Bruns argues that two cases, *Gregory v. Ashcroft*, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), and *Zielasko v. State of Ohio*, 873 F.2d 957 (6th Cir. 1989), control my answer to this rationality question. In both cases, the reviewing

court addressed the issue of whether mandatory retirement laws for state judges satisfied the minimal demands of rational basis scrutiny under the Equal Protection Clause. *See Gregory,* 501 U.S. at 470, 111 S.Ct. 2395; *Zielasko,* 873 F.2d at 961. Both courts held that it did. *See Gregory,* 501 U.S. at 473, 111 S.Ct. 2395; *Zielasko,* 873 F.2d at 961–62. While telling examples of the deferential nature of rational basis scrutiny, *Gregory* and *Zielasko* nevertheless do not act in this case with the force of binding precedent. Neither approached the precise constitutional issue before me: Does the State's method of determining a state judicial candidate's eligibility for office by age *at the time of election* violate the Equal Protection Clause?

The judges answer that it does because the line drawn by the State has the flavor of arbitrariness. This is the heart of their equal protection challenge. The judges believe that fate's choice of a birthday is a poor way to decide who will have a chance to seek state judicial office.

Maybe that is so. But the truth of that point does not matter in a rational basis examination. The Supreme Court developed rational basis scrutiny in response to the inherent need of the legislative branch to craft politically-acceptable, and thus sometimes rough, solutions to often difficult and pressing policy problems. *See Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) ("The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific"). . Rational basis scrutiny therefore "reflect[s] the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." *Murgia,* 427 U.S. at 314, 96 S.Ct. 2562. "Perfection in making the necessary classifications is neither possible nor necessary." *Id.*

▮ Yet perfection is what the judges would have me require. This I cannot do.

As long as the State can demonstrate that its classification is rationally related to a legitimate governmental objective, it has satisfied the Equal Protection Clause. The State asserts that the objectives of its age-based eligibility law are several: to preserve judicial competency; to avoid case-by-case determinations of mental and physical qualifications; to increase judicial opportunities for qualified persons; to avoid the administrative hardships of mid-term retirements; and to accomplish transitions between judicial officeholders through the democratic process rather than through mid-term appointments.

All are legitimate policy objectives. The Michigan election law has some rational relationship to each, but especially the two primary ones: that is, preserving judicial competency and avoiding the disruption of mid-term mandatory retirements. The people of Michigan could have rationally concluded that the inevitable progress of age threatens the competency of their judges, and so an age limit would be a rational means to resolve that concern. The people of Michigan could also have rationally concluded that the best way to implement that age limit was a system of age-based eligibility for state judicial candidates because such a system would avoid the inefficient disruptions of mid-term retirements imposed by the simple mandatory retirement system of the type approved in *Gregory.*

In the end, the people of Michigan chose a way of screening state judicial candidates that seeks to protect both the competency of the judiciary and its efficiency. Although it may not be a perfect system, it is nevertheless one with several rational bases for its disparate treatment of judicial candidates. That is all the Equal Protection Clause requires. *See Central State Univ. v. Am. Ass'n of Univ. Professors, Central State Univ. Chapter,* — U.S. ——, 119 S.Ct. 1162, 1163, 143 L.Ed.2d 227 (1999) (holding that a classification "cannot run afoul of the Equal Protection Clause if there is a rational relationship between

disparity of treatment and some legitimate governmental purpose"). The judges' equal protection claim therefore fails.

### Conclusion

Accordingly, the judges' motion for summary judgment is DENIED and the State's and Ms. Bruns' motions for summary judgment are GRANTED.

IT IS SO ORDERED.